**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

REGINA ZIMMER, §
§
        Plaintiff, §
§
v. §
§
                               §        CIVIL ACTION NO. 4:14-CV-347-CAN
CAROLYN W. COLVIN, COMMISSIONER §
OF SOCIAL SECURITY §
ADMINISTRATION, §
§
        Defendant. §
§

## MEMORANDUM OPINION AND ORDER

Plaintiff brings this appeal under 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for disability insurance benefits [Dkt. 1; Dkt. 12]. After reviewing the Briefs submitted by the Parties, as well as the evidence contained in the Administrative Record, the Court finds that the Commissioner's decision should be **AFFIRMED**.

## BACKGROUND

### I.      PROCEDURAL HISTORY OF THE CASE

Plaintiff filed an application for disability insurance benefits under Title II of the Social Security Act ("Act") on February 23, 2011, alleging an onset of disability date of January 21, 2011 [TR at 307, 309]. Plaintiff's application was initially denied by notice on June 8, 2011, and denied again upon reconsideration on September 2, 2011. *Id.* at 150, 162. On September 26, 2011, Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ") [TR at 165], and a hearing was held on March 21, 2012. *Id.* at 76. The ALJ denied benefits on April 26, 2012. *Id.* at 128. Plaintiff's request for Appeals Council review was

granted [TR at 206], and the Appeals Council vacated the ALJ's decision because it was not supported by substantial evidence and remanded the case for further clarification. *Id*. at 144. On May 2, 2013, a second ALJ hearing was held; however, the ALJ postponed the hearing to arrange for a medical expert to attend and testify regarding Plaintiff's medical condition. *Id*. at 74-75. On July 1, 2013, the second ALJ hearing resumed. *Id*. at 96. Plaintiff, represented by counsel, vocational expert Suzette Skinner ("Ms. Skinner"), and medical experts Dr. Nancy Tarrand ("Dr. Tarrand") and Dr. Kweli Amusa ("Dr. Amusa") testified at the hearing. *Id*. at 299-302. The ALJ partially granted benefits on September 11, 2013 [TR at 19, 26-27],[1] and Plaintiff's request for Appeals Council review was denied on April 2, 2014, making the decision of the ALJ the final decision of the Commissioner. *Id.* at 1.

On May 30, 2014, Plaintiff filed her Complaint in this Court [Dkt. 1]. Plaintiff filed her Brief on Review of the Social Security Administration's Denial of Benefits on November 13, 2014 [Dkt. 12], and Defendant filed her Brief in Support of the Commissioner's Decision on January 12, 2015 [Dkt. 13]. On January 14, 2014, the Administrative Record was received from the Social Security Administration [Dkt. 14], and on January 23, 2015, Plaintiff filed her Reply Brief [Dkt. 15]. On June 23, 2015, this case was assigned to the undersigned by consent of all Parties for further proceedings and entry of judgment [Dkt. 17].

## II.    STATEMENT OF RELEVANT FACTS

### 1.    *Age, Education, and Work Experience*

Plaintiff was born on March 11, 1965, and was forty-five years of age when she applied for disability benefits. *Id.* at 124. Plaintiff completed the eleventh grade. *Id.* at 92. Plaintiff

---

[1] Discussed in greater detail *infra*, the ALJ found Plaintiff disabled beginning March 1, 2013; however, Plaintiff alleges an onset disability date of January 21, 2011 [TR at 307]. The alleged onset disability date is the subject of Plaintiff's appeal [*see* Dkt. 12].

was a certified nursing assistant ("CNA") for fifteen years prior to her alleged onset of disability date. *Id*. at 79.

### 2. *Medical Record Evidence*

Plaintiff's medical records reflect that she suffers from back pain, diabetes mellitus with peripheral neuropathy,[2] arthritis, obesity, and cellulitis. *Id*. at 495, 510, 512-13, 515, 521, 525. On January 23, 2011, Plaintiff was admitted to Wilson N. Jones Medical Center for leg pain and flu-like symptoms.[3] *Id*. at 1068, 1076. The assessment was influenza and cellulitis on the left leg. *Id*. at 1068, 1075. On January 31, 2011, at a follow up appointment with her primary care physician Dr. C. David Garvin ("Dr. Garvin"), Plaintiff complained of back pain, cellulitis, chronic obstructive pulmonary disease, and diabetes mellitus. *Id*. at 483. At a February 7, 2011, appointment, Dr. Garvin noted Plaintiff was experiencing painful gait, effusion, tenderness, and limited range of motion in her right knee. *Id*. at 573. On February 8, 2011, Plaintiff met with a podiatrist who noticed she had a severe callus and blisters on her fifth left toe. *Id*. at 543. Plaintiff ultimately had her fifth left toe amputated on March 1, 2011, due to severe infection and osteomyelitis. *Id*. at 539. Plaintiff has not had further surgeries since this amputation, but based upon a review of her medical records her peripheral neuropathy has slowly progressed.

To that end, after her fifth left toe amputation, Plaintiff underwent an examination on April 25, 2011, by Dr. Andrew Wade ("Dr. Wade"), during which Plaintiff reported that while barefoot she required a cane to walk; Plaintiff reported she did not need a cane if she was not walking on her bare feet (i.e. if she was wearing shoes). *Id*. at 547. Plaintiff also reported

---

[2] Social Security Regulations define peripheral neuropathy as a disorder that "results when the kidneys do not adequately filter toxic substances from the blood. These toxins can adversely affect nerve tissue. The resulting neuropathy may affect peripheral motor or sensory nerves, or both, causing pain, numbness, tingling, and muscle weakness in various parts of the body." 20 C.F.R. § Pt. 404, Subpt. P, App. 1.

[3] As Plaintiff alleges an onset disability date of January 21, 2011, and Plaintiff has been determined disabled as of March 1, 2013, the Court does not herein recite Plaintiff's extensive medical records prior and/or subsequent to these dates.

abnormal gait and abnormal ability to stand due to a lack of sensation in her feet. *Id*. at 550.

Dr. Wade opined that Plaintiff could sit (with normal breaks) for a total of six hours in an eight

hour workday, that she was not limited in operating hand and/or foot controls, but she had

functional limitations in standing and walking and in lifting and carrying. *Id*. at 555.

Subsequently, at three separate doctor's appointments, on June 28, 2011 with Dr. Garvin,

July 27, 2011 with Physician Assistant Aldo Torrente, and August 24, 2011 with Nurse

Practitioner Patricia McClain, Plaintiff's gait was noted as normal in her medical records.

*Id*. at 566, 660, 663. On September 21, 2011, Plaintiff had an appointment with Dr. Garvin, and

while Plaintiff was noted to have back pain and chronic obstructive pulmonary disease – her gait

continued to be normal. *Id*. at 677. Dr. Garvin again examined Plaintiff on November 21, 2011,

and he noted Plaintiff's arthritis, back pain, and cellulitis; however, gait was noted to be normal.

*Id*. at 681. At five different doctor's appointments/examinations from March 7, 2012 through

February 7, 2013, Plaintiff's gait was noted to be normal. *See id*. at 685, 1025, 1027, 1029,

1035. On March 20, 2013, Plaintiff sought emergency room treatment, at which time it was

noted she was ambulatory with a cane. *Id*. at 695-98. From this point forward it is undisputed

Plaintiff's peripheral neuropathy progressed; and her condition further deteriorated. *Id*. at 53.

### 3. *Testimony Presented at the Second ALJ Hearing ("Hearing")*

#### a. *Plaintiff's Testimony*

At the Hearing, Plaintiff testified that she uses a cane and sometimes a walker since her

left fifth toe was amputated, and that she cannot walk a city block. *Id*. at 71-72, 80-81. Plaintiff

also testified that she cannot always afford insulin to control her diabetes. *Id*. at 73. At the

Hearing, Plaintiff stated that she cannot stand long enough to go to the grocery store, but is able

to take care of bathing and other personal needs. *Id*. at 71, 81. Plaintiff further stated that she

has problems balancing her weight, which results in her falling, and that she is only able to lift a half-gallon of milk. *Id*. at 88. Plaintiff testified that she needs to lay down at least two to three hours in a day due to the pain in her feet and/or legs, and that two of her fingers on each hand are numb. *Id*. at 89-91.

### b.    *Medical Expert Testimony*

#### i.    *Dr. Tarrand*

At the Hearing, Dr. Tarrand testified as a psychiatric medical expert. *Id*. at 98-99. The ALJ asked Dr. Tarrand for her medical opinion as to whether Plaintiff meets or equals any Medical Listing. *Id*. at 99. Dr. Tarrand testified that Plaintiff has been prescribed medication for anxiety and depression by a non-psychiatric provider, and therefore, the symptoms of depression and anxiety are not well documented. *Id*. Dr. Tarrand further explained that while Plaintiff's medical records indicate that she meets the criteria for Medical Listing 12.04 and/or 12.06,[4] there is a lack of physical data in Plaintiff's medical records to demonstrate that she in actual fact meets these Listings. *Id*. Dr. Tarrand further testified that: (1) Plaintiff does not meet the Listing 12.00 Paragraph B criteria;[5] (2) Plaintiff has the ability to understand, remember, and carry out simple instructions; (3) Plaintiff has the ability to make judgments commensurate with the functions of unskilled work; and (4) Plaintiff has the ability to appropriately respond to supervision, coworkers, and usual work situations. *Id*. at 100.

---

[4] Medical Listing 12.04 provides the criteria for affective disorders "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome." 20 C.F.R. § Pt. 404, Subpt. P, App. 1. Medical Listing 12.06 provides the criteria for anxiety related disorders where "anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders. *Id*.
[5] Social Security Regulations mandate specific procedures for evaluating mental impairments, and Medical Listing 12.00 addresses various potentially disabling mental impairments, including Listings 12.04 and 12.06. *See id; see also* 20 C.F.R. § 404.1520a. Listing 12.00 requires evaluation of two sets of criteria known as "Paragraph A" and "Paragraph B." *Id*. Paragraph A criteria relate to medical findings and Paragraph B criteria address impairment-related functional limitations. *Id*. "Generally a claimant must satisfy one criterion in Paragraph A and two or more in Paragraph B to meet the Listings level of severity and thus qualify for presumptive disability." *Moore v. Barnhart*, No. 1:03-CV-469, 2004 WL 3237347, at *2 (E.D. Tex. Dec. 8, 2004).

## ii. Dr. Amusa

At the Hearing, Dr. Amusa testified as a medical expert. *Id.* at 102. The ALJ asked Dr. Amusa for her medical opinion as to whether Plaintiff meets or equals Medical Listing 11.14 – the listing for peripheral neuropathy.[6] *Id.* at 103. Dr. Amusa testified that Plaintiff suffers from the severe impairment of diabetes complicated by peripheral neuropathy and foot ulcers, and also suffers from osteoarthritis in her right knee and her feet. *Id.* at 104. Dr. Amusa further noted that Plaintiff has had issues with non-compliance with treatment medications. *Id.* Ultimately, Dr. Amusa unequivocally testified that Plaintiff equals medical listing 11.14 as of March 2013. *Id.* Dr. Amusa testified that prior to this date Plaintiff would be sedentary with the additional limitations on the use of foot controls and lower extremities only occasionally. *Id.* As previously noted, the ALJ found Plaintiff disabled as of March 1, 2013. *Id.* at 53.

On cross-examination, Plaintiff's attorney questioned Dr. Amusa about evidence in the record demonstrating Plaintiff may have met Medical Listing 11.14 prior to March 2013, due to a disturbance in gait and/or her alleged inability to ambulate. *Id.* at 106. Specifically:

> [Plaintiff's attorney:] [U]nder 11.14, it refers back to 11.04, which references significant and persistent disorganization of motor function and to extremities resulting in disturbance of gross and dexterous movements or gait in station. Now, there... is in the record some evidence prior to March of 2013 that [Plaintiff] was having some ***disturbance of gait in station***. Is that not right?
>
> [Dr. Amusa:] Again, that doesn't fit 11.14 but my understanding was that particular listing aspires as that there is ***marked disturbance in one's ability to ambulate***.
>
> [Plaintiff's attorney:] Well... for example, April 25th, 2011 ... the [consultative exam], by Andrew Wade, he indicates that [Plaintiff] cannot feel her feet on the floor. That she has an abnormal gait, she has no balance due to loss of sensation....

---

[6] Currently in dispute are Medical Listing 11.14, which concerns peripheral neuropathies, and Medical Listing 1.02, which concerns major dysfunction of a joint(s) due to any cause. *See* 20 C.F.R. § Pt. 404, Subpt. P, App.1. The requirements/criteria for both Medical Listing 1.02 and 11.14 are discussed in greater detail *infra*. The Parties do not dispute Plaintiff does not/did not meet Listings 12.04/12.06.

*Id*. at 105-06 (emphasis added). Plaintiff's attorney then further directed Dr. Amusa to the Social Security Regulation's definition of effective ambulation and asked Dr. Amusa if Listing 1.02 applied to Plaintiff:

> [Plaintiff's attorney:] And if we're talking about effective ambulation it – *you have to use crutches is one example they give*. However, there are other examples they give, such as, *examples of ineffective ambulation include [sic] the inability to walk a block at a reasonable pace on rough or uneven surfaces*. That's one of the definitions. The inability to... carry out routine ambulatory activities such as shopping [and] banking, to climb a few steps at a reasonable pace. And so what my question is to you is whether, in light of [Plaintiff's] peripheral neuropathy and all of her combined impairments, whether her impairment would be medically equivalent, that is to say that she would have the same functional impact upon her activities as a result of these combined impairments. Not whether she would strictly meet section 1.04 or any of the section 1 listings.
>
> [Dr. Amusa:] Certainly if the record documents that she has to [sic] *the inability to walk a block at a reasonable pace* ... I think at the time that is documented in the record it would be *reasonable to equal her under 11.14 at that time*.

*Id*. at 109 (emphasis added). Dr. Amusa then qualified this testimony by stating "I just don't see the details [in Plaintiff's medical records] required to show ... how severe this is with regards to her ability to ambulate." *Id*. at 111-12. Dr. Amusa also pointed out that Plaintiff's medical records must demonstrate "more than her complaints of pain, but, also, [describe] her ability or inability to function in order to meet a Medical Listing." *Id*. at 111-12. Plaintiff's counsel then directed Dr. Amusa to the February 7, 2011, appointment with Dr. Garvin which noted Plaintiff was experiencing painful gait:

> [Plaintiff's attorney:] But as of – to – February 7th 2011, with that note, an equivalency could be established?
>
> [Dr. Amusa:] Yes. She had the toe amputation. So I think yes, in February there is a note to support it. In January they don't, actually, see full support in that note.

[Plaintiff's attorney:] Judge, we'd be willing to amend to 02/07/11. Just to put an end to this.

*Id*. at 117, 573.

### b. *Vocational Expert Testimony*

At the Hearing, Ms. Skinner testified as a vocational expert. *Id*. at 120. The ALJ asked Ms. Skinner a hypothetical question that incorporated both of the medical experts' testimony, as well as the age, work history, and education of Plaintiff. *Id*. at 121. The ALJ asked Ms. Skinner if there would be any jobs for such a person. *Id*. Ms. Skinner testified, considering the hypothetical, a person in Plaintiff's position could perform work as a charge account clerk or a food and beverage order clerk. *Id*. On cross-examination by Plaintiff's attorney, Ms. Skinner further testified that if the requirements of frequent, unscheduled rest breaks and elevating the legs to waist level were added to the hypothetical person, the person in Plaintiff's position would not be able to perform work as a charge account clerk or a food and beverage order clerk. *Id*. at 122.

## III. FINDINGS OF THE ALJ

### 1. *Sequential Evaluation Process*

Pursuant to the statutory provisions governing disability determinations, the Commissioner has promulgated regulations that establish a five-step process to determine whether a claimant suffers from a disability. 20 C.F.R. § 404.1520. First, a claimant who is engaged in substantial gainful employment at the time of his disability claim is not disabled. 20 C.F.R. § 404.1520(b). Second, the claimant is not disabled if his alleged impairment is not severe, without consideration of his residual functional capacity, age, education, or work experience. 20 C.F.R. § 404.1520(c). Third, if the alleged impairment is severe, the claimant is considered disabled if his impairment corresponds to a listed impairment in 20 C.F.R., Part 404,

Subpart P, Appendix 1.  20 C.F.R. § 404.1520(d).  Fourth, a claimant with a severe impairment that does not correspond to a listed impairment is not considered to be disabled if he is capable of performing his past work.  20 C.F.R. § 404.1520(e).  Finally, a claimant who cannot return to his past work is not disabled if he has the residual functional capacity to engage in work available in the national economy.  20 C.F.R. § 404.1520(f).  Under the first four steps of the analysis, the burden lies with the claimant to prove disability and at the last step the burden shifts to the Commissioner.  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).  If at any step the Commissioner finds that the claimant is or is not disabled, the inquiry terminates.  *Id.*

### 2.    *ALJ's Disability Determination*

The ALJ partially granted Plaintiff's request for benefits on September 11, 2013, finding Plaintiff disabled as of March 1, 2013, through the date of his decision [TR at 26].  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the period from her alleged onset date, January 21, 2011, through the date of his decision.  *Id*. at 29.  At step two, the ALJ found that Plaintiff, since the alleged onset date of disability (January 21, 2011), has the severe impairments of diabetes mellitus with peripheral neuropathy, osteoarthritis of the right knee, osteoarthritis of the lumbar spine, osteoarthritis of both feet, obesity, a depressive disorder, and an anxiety disorder.  *Id*.  At step three, the ALJ found that, prior to March 1, 2013, these impairments, or combination of impairments, did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, including but not limited to Listings 1.02, 1.04 (which describes disorders of the spine), 9.09 (which describes obesity), 11.14, 12.04, and 12.06.[7]  *Id*. at 41-45.  At step four, the ALJ found that prior to March 1, 2013, Plaintiff had the residual functional capacity to perform sedentary work except

---

[7] As the Court previously mentioned, currently in dispute are Medical Listing 11.14 and Medical Listing 1.02.  The Parties do not dispute Plaintiff does not/did not meet Listings 1.04, 9.09, 12.04, and 12.06.

for the inability to more than occasionally operate foot controls, inability to climb ladders, ropes, or scaffolds, inability to more than occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl, inability to tolerate concentrated exposure to temperature extremes, inability to tolerate even moderate exposure to uneven terrain, and inability to understand, remember and carry out detailed and/or complex job tasks. *Id*. at 45. Continuing the step four analysis, the ALJ then determined that Plaintiff is unable to perform her past relevant work as a CNA/home health aide, which requires the performance of work-related activities precluded by Plaintiff's residual functional capacity determination. *Id*. at 50. However, the ALJ found that there were jobs that existed in significant numbers from January 21, 2011, to March 1, 2013, that Plaintiff could have performed. *Id.* at 51. Based on this determination, the ALJ concluded Plaintiff was not disabled from January 21, 2011, through March 1, 2013, but beginning March 1, 2013, the severity of Plaintiff's impairments medically equaled Listing 11.14, thereby making Plaintiff disabled as of that date. *Id*. at 53.

## STANDARD OF REVIEW

In an appeal under § 405(g), this Court must review the Commissioner's decision to determine whether there is substantial evidence in the record to support the Commissioner's factual findings and whether the Commissioner applied the proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985); *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983). This Court cannot reweigh the evidence or substitute its judgment for that of the Commissioner. *Bowling v. Shalala*, 36 F.3d 431, 434 (5th Cir. 1995).

Additionally, any conflicts in the evidence, including the medical evidence, are resolved by the ALJ, not the reviewing court. *Carry v. Heckler*, 750 F.2d 479, 484 (5th Cir. 1985).

The legal standard for determining disability under Titles II and XVI of the Act is whether the claimant is unable to perform substantial gainful activity for at least twelve months because of a medically determinable impairment. 42 U.S.C. §§ 423(d), 1382c(a)(3)(A); *see also Cook*, 750 F.2d at 393. "Substantial gainful activity" is determined by a five-step sequential evaluation process, as described above. 20 C.F.R. § 404.1520(a)(4).

As part of the five-step sequential evaluation process, the ALJ acts as fact finder considering both objective evidence, such as medical records, and subjective evidence, such as a claimant's allegations regarding symptoms and pain. *Salgado v. Astrue*, 271 F. App'x 456, 458 (5th Cir. 2008); *see also Greigo v. Sullivan*, 940 F.2d 942, 945 (5th Cir. 1991). In evaluating the claimant's subjective evidence and credibility, the ALJ is required to follow a two-step process. *See Salgado,* 271 F. App'x at 458; *see also Titles II & XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements*, SSR 96-7P (S.S.A. July 2, 1996). First, the ALJ must determine whether there is an impairment that reasonably produces the symptoms of which the claimant complains ("Step 1"). *Salgado,* 271 F. App'x at 458; *see also Stevenson v. Colvin*, No. 1:11-cv-168, 2013 WL 1181456, at *3-4 (E.D. Tex. Mar. 20, 2013). If the ALJ finds no impairment, the claimant is not disabled. *Salgado,* 271 F. App'x at 458. If the ALJ identifies an impairment, the ALJ then considers the claimant's statements regarding their symptoms and the remaining evidence in the record to determine the strength of the symptoms and how the symptoms affect the claimant's ability to do basic work ("Step 2"). *Stevenson*, 2013 WL 1181456, at *3. Furthermore, the ALJ must consider the claimant's subjective complaints and allegations regarding their capacity to do work, but may find that

those complaints are not credible or are exaggerated in light of the medical evidence. *See Wilson*, 2014 WL 5343200, at \*7.

## ANALYSIS

On appeal, Plaintiff presents a single issue for consideration: whether the Commissioner properly found Plaintiff not disabled under the Social Security Act prior to March 1, 2013 [*see* Dkt. 12 at 4]? Specifically, Plaintiff argues that the ALJ's March 1, 2013, onset of disability date is not supported by substantial evidence and that the onset date should be January 21, 2011, because: (1) the ALJ "misunderstood" Dr. Amusa's testimony that Plaintiff equaled Medical Listing 11.14 in February 2011; (2) the ALJ effectively "played doctor" by picking and choosing only part of Dr. Amusa's testimony to support a March 1, 2013, onset of disability date; and (3) even assuming Dr. Amusa applied the more onerous definition of "inability to ambulate effectively" required by Medical Listing 1.02, Plaintiff's medical records demonstrate that she meets that definition as of January 21, 2011. *Id*. at 14, 16, 20. The Commissioner argues, to the contrary, that the ALJ properly assessed Plaintiff's onset of disability date and "to the extent Dr. Amusa's testimony could be construed as indicating an earlier disability onset date, the ALJ specifically found that Dr. Amusa's contingent testimony on [that] issue was not supported by the evidence of record" [Dkt. 13 at 4, 8 (citing TR at 42-44)]. The Court agrees, notwithstanding Plaintiff's arguments, that in this instance the ALJ's disability determination is supported by substantial evidence.

## I. MEDICAL LISTINGS 1.02 AND 11.14

As an initial matter, the Court sets forth the criteria in Medical Listing 1.02 as compared to Medical Listing 11.14, because these Listings are central to this Court's analysis [*see e.g.,* TR at 42, 63]. Listing 1.02 (major dysfunction of a joint(s) (due to any cause)) states:

Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in ***inability to ambulate effectively***, as defined in 1.00B2b; or

B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R. § Pt. 404, Subpt. P, App. 1 (emphasis added). The Social Security Regulations define

"inability to effectively ambulate" as:

[A]n extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.) []

To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

*Id*. Furthermore, 1.00(B)(2)(a) requires that "[t]he inability to ambulate effectively or the inability to perform fine and gross movements effectively ***must have lasted, or be expected to last 12 months***." *Id*. (emphasis added).

Whereas Listing 11.14 states: "Peripheral neuropathies... [w]ith disorganization of motor function as described in 11.04B, in spite of prescribed treatment." *Id*. Listing 11.04B describes "significant and persistent disorganization of motor function" and directs adjudicators to Listing 11.00C for further instruction:

> Central nervous system vascular accident. With one of the following more than 3 months post-vascular accident:
>
> B. Significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (*see* 11.00C).

*Id*. Listing 11.00C explains persistent disorganization of motor function as:

> Persistent disorganization of motor function in the form of paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral, cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combinations, frequently provides the sole or partial basis for decision in cases of neurological impairment. The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms.

*Id*. Social Security Regulations require that "the peripheral neuropathy must be a severe impairment" that ***lasts or is "expected to last for a continuous period of at least 12 months***. *Id.* (emphasis added). With that background, the Court will address each of Plaintiff's arguments in turn.

## II.     DR. AMUSA'S TESTIMONY

Plaintiff contends that the ALJ "misunderstood" or otherwise misstated Dr. Amusa's testimony related to the onset of disability date, and/or the ALJ effectively "played doctor" by relying on only part of Dr. Amusa's testimony to support the March 2013 onset date [Dkt. 12 at 14, 16]. Defendant disagrees and asserts that the ALJ's findings clearly show: (1) a detailed examination of Dr. Amusa's testimony on cross-examination; (2) a correct characterization of Dr. Amusa's testimony as contingent on findings that could not be adequately identified in

Plaintiff's medical records; and (3) a proper resolution of any potential conflicts between Dr. Amusa's testimony and Plaintiff's medical record evidence [Dkt. 13 at 8].

### 1.    The ALJ's Alleged Misunderstanding of Dr. Amusa's Testimony

As an initial matter, the Court notes that the ALJ did misstate the Medical Listing Dr. Amusa was referring to in his findings (as discussed further *infra*); however, this Court finds that any confusion resulting from such misstatement is harmless error because the ALJ thoroughly examined Dr. Amusa's cross-examination testimony and resolved any conflict between her testimony and Plaintiff's medical records.

By way of background, Social Security Ruling ("SSR") 83–20 prescribes the policy and procedure for determining the onset date of disability and requires that a medical advisor be consulted to determine a claimant's disability onset date when the date cannot be precisely determined. *Spellman v. Shalala*, 1 F.3d 357, 360-61 (5th Cir. 1993) (citing Titles II & XVI: Onset of Disability, SSR 83–20 (S.S.A. 1983)). In *Spellman*, the Fifth Circuit held that "in cases involving slowly progressive impairments, when the medical evidence regarding the onset date of a disability is ambiguous and the [Commissioner] must infer the onset date, SSR 83–20 requires that that inference be based on an informed judgment" and the Commissioner "cannot make such an inference without the assistance of a medical advisor." *Id*. at 363 (citing *DeLorne v. Sullivan*, 924 F.2d 841, 848 (9th Cir. 1991)). Relevant factors in determining the onset date are the claimant's allegation as to when disability began, the date the disability caused the claimant to stop working, and the medical evidence. *Id*. at 361 (citing SSR 83–20; *Ivy v. Sullivan*, 898 F.2d 1045, 1048 (5th Cir. 1990)). Medical evidence is the primary factor. *Id*. Thus, before making any inference as to Plaintiff's disability onset date, the ALJ in the present

case was required to consult Dr. Amusa and the medical evidence, in addition to Plaintiff's allegations as to when her disability began.

It is undisputed that the ALJ consulted medical expert Dr. Amusa regarding Plaintiff's alleged onset of disability date in addition to considering Plaintiff's own allegations regarding her alleged onset of disability [*e.g.,* TR at 43]. Plaintiff contends that Dr. Amusa's testimony indicates Plaintiff equaled Listing 11.14 in February 2011, not Listing 1.02 as set forth in the ALJ's findings [Dkt. 12 at 14]. Thus, in dispute is whether the ALJ understood (1) Dr. Amusa's testimony regarding which Medical Listing Plaintiff met or equaled, and (2) on what date Plaintiff is alleged to have met or equaled the particular Listing [*see* Dkt. 12 at 14]. The ALJ's findings state:

> [Plaintiff's] Counsel has vehemently argued that the claimant medically equals Listing 1.02, based on the combination of her impairments. Counsel has argued that there is evidence of peripheral neuropathy as early as 2009, and he has further argued that there is evidence of gait abnormality as evidenced by the consultative examination in April, 2011 and Dr. Garvin's assessment on February 7, 2011. He explicitly argued that there was also evidence to ambulate [sic] on uneven terrain, which was an example of inability to ambulate effectively. After extensive cross-examination of Dr. Amusa, Dr. Amusa testified the claimant medically equaled ***Listing 1.02 from February 7, 2011 to March 1, 2013***. However, she qualified her opinion by stating that the inability to ambulate was not well-established. I concur fully that it is not well-established, and further find her testimony to the effect the claimant medically equals Listing 1.02 during the period of time from February 7, 2011 to March 1, 2013 to be entitled to no weight, as the record fails to provide support for her assessment.

*Id.* at 42-43 (internal citations omitted) (emphasis added). An extensive review of the Hearing transcript by this Court indicates that Plaintiff's counsel was cross-examining Dr. Amusa about the criteria in Medical Listing 1.02 and 11.14 interchangeably, and that Dr. Amusa was also generally responding by referencing the different requirements/criteria in Listings 1.02 and 11.14 interchangeably [*see* TR 107-117]. Having said that, the record does clearly reflect that Dr. Amusa referred to Listing 11.14 when she said it was reasonable to consider that Plaintiff

equaled a Medical Listing. *See id.* at 116-17. More specifically, Dr. Amusa was referencing Medical Listing 11.14 when she stated "[s]o I think yes, in February there is a note to support it. In January they don't actually, see full support in that note," because, prior to making this statement, she states:

> [I]t is always a challenge with medical records and them being thorough to the point that we would like to have all the I's dotted and T's crossed. And, certainly, on this – his ex with the treating physician, which is a month prior – a month after her alleged onset date. You know, it is noted, again, that she is morbidly obese with a BMI of 43. She is on the physical – to stand, is able to establish or does comment that ambulation's painful for her. He does not reference that she is using anything to help her ambulate. But, certainly, with the, the well documented peripheral neuropathy and the complications there of, which have been her foot ulcers and infections, also, cellulitis in her feet, fractures in her feet. ***I think it is reasonable that turn [sic] to consider her equaling listing 11.14*** though we don't have the – I can say that we don't have the inability to effectively ambulate well established based on the, the exam by her treating physician.

*Id.* at 116-17 (emphasis added). Accordingly, the ALJ did misstate that Dr. Amusa testified the claimant medically equaled Listing 1.02. *Id.* at 43. The ALJ should have stated that Dr. Amusa testified the claimant medically equaled Listing 11.14.

The ALJ's misstatement, however, amounts to harmless error. The Fifth Circuit has held that procedural perfection in administrative proceedings is not required and any variation amounts to harmless error that is not grounds for reversal, unless the substantial rights of a party have been affected. *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988); *Audler*, 501 F.3d at 448. "[P]rocedural improprieties ... will therefore constitute a basis for remand only if such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision." *Alexander v. Astrue*, 412 F. App'x 719, 722 (5th Cir. 2011) (quoting *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988) (upholding the ALJ's non-disability finding because alleged error did not "render the ALJ's determination unsupported by substantial evidence"); *see also Finley v. Colvin*, No. 14-430, 2013 WL 5162476, at *5 (M.D. La. Aug. 11, 2015) ("[T]he

presence of a single incorrect digit in two of the DOT codes reprinted in the ALJ's decision does not constitute reversible error. Instead the deficiencies identified by Plaintiff are ... typographical errors, made by the ALJ, as opposed to unreliable testimony provide by the V[ocational] E[xpert].")

Here, the ALJ's misstatement of the applicable Medical Listing Dr. Amusa referred to during cross-examination is akin to a typographical error. Such an error does not cast doubt on the existence of substantial evidence to support the ALJ's determination of the onset of disability date. Even though Plaintiff's medical evidence demonstrates that she suffered from several impairments prior to March 1, 2013, substantial evidence supports the ALJ's conclusion that these impairments did not become sufficiently severe as to prevent her from working until March 1, 2013. *Berry v. Astrue*, No. 3:11-CV-2817, 2013 WL 524331, at *17 (N.D. Tex. Jan. 25, 2013) (holding that substantial evidence supported the ALJ's selection of the disability onset date even though medical evidence showed the claimant suffered from several impairments prior to that date) (citing *Halterman ex rel. Halterman v. Astrue*, No CIV.A. 11-0630, 2012 WL 3764051, at *11 (W.D. La. July 20, 2012)). Accordingly, the ALJ's finding of a March 1, 2013, onset of disability date should be affirmed because this decision is supported by substantial evidence in the record (as discussed in greater detail *infra*), and the ALJ's misstatement as to the applicable Listing amounts to harmless error.

### 2. The ALJ Effectively "Played Doctor"

Plaintiff also contends that the ALJ effectively "played doctor" by relying on only part of Dr. Amusa's testimony to support the March 1, 2013, disability onset date [Dkt. 12 at 16]. Defendant maintains that Dr. Amusa's testimony did not indicate that she supported an earlier disability onset date; however, to the extent Dr. Amusa's testimony conflicts with Plaintiff's

medical records, the ALJ properly resolved any such conflicts in favor of the March 2013 onset of disability date [Dkt. 13 at 7- 8]. The Court does not agree with Plaintiff that the ALJ rejected Dr. Amusa's opinion in substitution for his own, thus "playing doctor" [Dkt. 12 at 17]. To the contrary (and discussed in greater detail below) the ALJ noted that to the extent Dr. Amusa's testimony was not supported by Plaintiff's medical records, such testimony should not be given controlling weight because Plaintiff's medical records do not conclusively establish that she meets or medically equals Listing 11.14 as of February 7, 2011 [TR at 43].

### a. *Lack of Clinical Evidence Supporting an Earlier Onset Date*

Both the ALJ and Dr. Amusa expressed concern at the Hearing about the lack of clinical findings – as opposed to Plaintiff's self-reports – demonstrating Plaintiff had difficulty ambulating and had an abnormal gait prior to March 2013. Specifically, Dr. Amusa's testimony indicates that she was concerned about distinguishing clinical evidence of Plaintiff's impairments from Plaintiff's self-reported limitations:

> Well her physical exams prior to that consultative exam and in parts of that, he, apparently, is noting her, her complaints or what would her ability like a review of symptoms ... what he says about it is, you know, do you have complaints, she says she can't feel things with her feet or uneven ground. So he's noting what exhibits then, you know, what she says she experiences.

[TR at 113-14]. On cross-examination, Dr. Amusa continued to state her concern for a lack of clinical evidence regarding Plaintiff's inability to ambulate:

> And I appreciate you pointing [Dr. Garvin's note on Plaintiff's symptoms] out. It's just that it doesn't tell us to what severity that the walking and standing have to be. I, I just don't see the details that's [sic] required to show that how [sic] severe this is with regards to her ability to ambulate ... I can say that we don't have the inability to effectively ambulate well established based on the exam by her treating physician.

*Id*. at 110, 116.

The ALJ was also concerned that prior to March 2013, Plaintiff's impairments were not severe enough to meet or equal either Medical Listing, and she was not experiencing an abnormal gait or the inability to effectively ambulate for at least twelve months, as required by the Medical Listings. *Id*. at 119 ("But, see, it has to last for a year. And that doesn't seem like – it, also, says that must be expected this inability to ambulate effectively must be – has to last a year."). Further, the ALJ expressly articulated his reasons for rejecting Plaintiff's alleged earlier onset date and gave a convincing rationale for selecting the later March 1, 2013, onset date. *Id*. at 53. As the medical evidence establishes, Plaintiff developed extensive foot ulcerations and cellulitis as of March 2013, and in April 2013, she sustained a fracture in her 5th metatarsal bone. *Id*. at 1192. However, prior to that time, the ALJ noted numerous inconsistencies between Plaintiff's allegations and her medical records:

> There are numerous inconsistencies in the claimant's allegations [compared to] the face of the documents. In her initial Function Report, which was completed after she underwent her left toe amputation, she indicated she did not use a cane. At [the] consultative examination in April, 2011 she reported she did not need a can unless she was barefoot. She now contends she has used a cane since her left toe amputation in March, 2011. Interestingly, clinical notations from Dr. Garvin reflect a normal gait with no evidence of use of an assistive device from June 2011 to March, 2013. The claimant has alleged she cannot stand or walk for any prolonged period; however, at the hearing, she testified she could wash dishes for 20 minutes and be on her feet 1 to 2 hours a day, which is entirely consistent with the residual functional capacity depicted above. She has alleged numbness in her hands, but there is no clinical evidence documenting any neurological abnormalities in the upper extremities. Moreover, by her own admission, she is able to drive and use the computer daily. There is no evidence of a change in her condition, until March 2013, when she testified her condition deteriorated.

*Id*. at 47. The ALJ also noted "[e]xcept for a short period of time in 2011 of approximately 3 months, [where Plaintiff] had documented gait abnormality... her gait was explicitly noted to be normal...." *Id*. at 42-43.

### b.       *Plaintiff's Medical Records Support the March 2013 Onset Date*

Plaintiff's medical records indicate that, from January 21, 2011, through March 1, 2013, her gait was documented as "normal" on at least ten occasions, was documented as abnormal only a total of two times, and there was no evidence that she consistently required the use of an assistive device (such as a cane) in order to walk [TR at 550, 566, 573, 660, 663, 677, 681, 685, 1025, 1027, 1029, 1035].   Based on a relatively complete medical chronology of Plaintiff's impairments, the ALJ found that her alleged onset of disability date, January 21, 2011, was inconsistent with her medical evidence [TR at 41-45].   From the medical evidence, he determined that between January 21, 2011, through March 1, 2013, Plaintiff had the residual functional capacity to perform sedentary work except for the inability to more than occasionally operate foot controls, inability to climb ladders, ropes, or scaffolds, inability to more than occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl, inability to tolerate concentrated exposure to temperature extremes, inability to tolerate even moderate exposure to uneven terrain, and inability to understand, remember and carry out detailed and/or complex job tasks. *Id*. at 45.   This finding is supported by Plaintiff's medical records; her gait being reported as normal numerous times and the lack of documentation the she required an assistive device to walk.  *Id*. at 566, 660, 663, 677, 681, 685, 1025, 1027, 1029, 1035; *Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991) ("The ALJ as factfinder has the sole responsibility for weighing the evidence and may choose whichever physician's diagnosis is most supported by the record.").

The ALJ is entrusted to make determinations regarding disability, including weighing inconsistent evidence, and medical evidence is the primary factor in determining when a slowly progressive impairment(s) becomes disabling.   20 C.F.R.  §  404.1527(c)(2) ("If any of the evidence in your case record, including any medical opinion(s), is inconsistent with other

evidence or is internally inconsistent, we will weigh all the other evidence and see whether we can decide whether you are disabled based on the evidence we have."); *see also Spellman,* 1 F.3d at 361 (5th Cir. 1993); SSR 83–20 (S.S.A. 1983)). Thus, the ALJ rightfully relied on the entirety of Plaintiff's medical records in determining that any statement Dr. Amusa made regarding an earlier onset of disability date is not supported by Plaintiff's medical evidence.

### 3. *Conclusion*

As the Court previously noted, there are numerous entries in Plaintiff's medical records which state that her gait was normal prior to March 1, 2013, and there is a lack of evidence demonstrating that she was unable to effectively ambulate prior to this date. To the extent Dr. Amusa's testimony indicates that Plaintiff established Listing 11.14 as of February 7, 2011, it is inconsistent with Plaintiff's medical records and the ALJ properly resolved this conflict in favor of Plaintiff's treating physicians' opinions. *See Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000) ("Conflicts in the evidence are for the Commissioner and not the courts to resolve."); *Muse*, 925 F.2d at 790 (explaining that the ALJ is responsible for weighing the medical record); *Carry*, 750 F.2d at 484 (explaining that any conflicts in the medical record are resolved by the ALJ and not the courts). Further, any misunderstanding of Dr. Amusa's testimony, to the extent one exists, amounts to harmless error. Accordingly, substantial evidence supports the ALJ's conclusion that Plaintiff's impairments did not become sufficiently severe as to prevent her from working until March 1, 2013.

## IV. SUBSTANTIAL EVIDENCE SUPPORTS THE ALJ'S DETERMINATION THAT PLAINTIFF DID NOT MEET MEDICAL LISTING 1.02 PRIOR TO MARCH 2013

Plaintiff also contends that, even though it is unclear if Dr. Amusa applied the Listing 11.14 requirements or the Listing 1.02 requirements, Plaintiff meets the more onerous

1.02/1.00(B)(2)(b)(2) regulatory definition of "inability to ambulate effectively" because she is unable to walk a block on rough or uneven surfaces [Dkt. 12 at 20]. The ALJ concluded, based on Plaintiff's medical records, that Plaintiff was not completely precluded from walking on uneven terrain, and further that her medical records, prior to March 1, 2013, fail to demonstrate the "extreme" loss of the ability to walk as required by the Social Security's definition of "inability to effectively ambulate" [TR at 43]. Specifically, the ALJ explained that:

> [F]or the period of time prior to March 1, 2013, I have duly considered Listing 1.02, which describes major dysfunction of a joint characterized by gross anatomical deformity and chronic joint pain and stiffness with signs of limitation of range of motion and diagnostic evidence of joint space narrowing, bony destruction, or akylosis. Furthermore, there must be inability to perform fine and gross movements or inability to ambulate effectively. Although the claimant has evidence of degenerative jiint [sic] disease of the right knee, there is no evidence of consistetn [sic] range of motion deficits. Moreover, as will be shown below more extensively in determining whether she medically equals Listing 1.02, there is no evidence of inability to ambulate effectively. There is no evidnce [sic] of an upper extremity abnormality. As such, the claimant's ostoe [sic] arthritis of the right knee and both feet does [sic] not meet the strict criteria of Listing 1.02.

*Id.* at 42. As the Court previously explained, the ALJ noted the numerous inconsistencies between Plaintiff's allegations and the medical record evidence. *Id*. at 48. For example, Plaintiff testified to using a cane since her fifth left toe was amputated; however, at the consultative exam in April 2011 she reported that she only used the cane if she was walking on her bare feet. *Id*. at 80-81, 547; *see also e.g., id.* at 47 (explaining that Plaintiff testified that she cannot stand or walk for any prolonged period of time; however, she also testified that she could be on her feet for one to two hours and could wash dishes for twenty minutes). Accordingly, the ALJ determined that Plaintiff's assertion that she was unable to effectively ambulate prior to March 1, 2013, "is simply unsupported by the longitudinal [medical] record" and "her allegations and contentions of symptomatology and functional limitations [are] exaggerated and only partially credible." *Id*. at 44, 48. The Court agrees.

Medical Listing criteria are demanding and stringent. *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994). The burden of proof rests with a claimant to prove and identify ***medical signs and laboratory findings*** that support all criteria for a Step 3 impairment determination. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria.") (emphasis added); *Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990). Medical Listing 1.02, as explained in 1.00(B)(2)(a), requires an inability to ambulate that has lasted, or is expected to last twelve months, and Listing 11.14 requires the peripheral neuropathy to be a severe impairment that lasts or is expected to last for a continuous twelve months. 20 C.F.R. § Pt. 404, Subpt. P, App. 1. Plaintiff's medical records indicate that on February 7, 2011, Dr. Garvin noted Plaintiff's gait as "painful with ambulation." However, at various doctor's appointments from June 28, 2011, through February 7, 2013, Plaintiff's gait was reportedly normal, and there is no evidence she required use of an assistive device in order to walk. *Id.* at 47, 566, 660, 663, 677, 681, 685, 1025, 1027, 1029, 1035. Given that Plaintiff's gait was described as normal and her required use of a cane is unsubstantiated prior to March 1, 2013, Plaintiff's impairments during that time cannot be said to meet or equal an individual with a sustained disturbance in gait or an individual who cannot "walk without the use of a walker, two crutches or two canes" or who cannot "walk a block at a reasonable pace on rough or uneven surfaces" for at least twelve months. *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1. Plaintiff has failed to prove, based on medical signs and laboratory findings, that she met the criteria for Listing 1.02 and/or Listing 11.14 prior to March 2013. Accordingly, the Court finds the ALJ's findings are supported by substantial evidence, and the Commissioner's disability onset date of March 1, 2013, should be affirmed.

## CONCLUSION

The record provides an adequate basis for the March 1, 2013, onset of disability date.

Accordingly, the Commissioner's decision should be **AFFIRMED**.

      **IT IS SO ORDERED.**

      **SIGNED this 25th day of January, 2016.**

_____
Christine A. Nowak
UNITED STATES MAGISTRATE JUDGE